# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| WARD SAKEIK, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | |
| KRISTI NOEM, in her official capacity as | § | |
| Secretary of the Department of Homeland | § | |
| Security; PAMELA BONDI, in her | § | |
| official capacity as Attorney General; | § | |
| TODD LYONS, in his official capacity as | § | |
| Acting Director of Immigration and | § | CIVIL ACTION NO. 3:25-cv-01597 |
| Customs Enforcement; JOSH JOHNSON, | § | |
| in his official capacity as Acting Director | § | |
| of Immigration and Customs | § | |
| Enforcement's Enforcement and Removal | § | |
| Operations Dallas Field Office; THOMAS | § | |
| BERGAMI, in his official capacity as | § | |
| Warden of the Prairieland Detention | § | |
| Center, | § | |
| | § | |
| Respondents. | § | |

# VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AND
# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Ward Sakeik (Petitioner), by and through her undersigned counsel, hereby files this verified petition for a writ of habeas corpus and a motion for a temporary restraining order to enjoin Respondents from removing her from the United States and detaining her unlawfully.

2. Petitioner is a stateless Palestinian who was admitted to the United States on a nonimmigrant visitor visa in 2010. Mrs. Sakeik's father, Nader Sakeik ("Nader"), filed an affirmative asylum claim in which she was a derivative beneficiary. The asylum claim was subsequently referred to the Immigration Court on June 6, 2011. After an immigration court denied Nader's asylum application, the family was ordered removed to Saudi Arabia, despite having no citizenship or legal residence in that country. She was subsequently released on June 12, 2015, with an Order of Supervision by the U.S. Department of Homeland Security.

3. The Department of Homeland Security (DHS) unlawfully attempted to remove Petitioner on June 11, 2025, to Israel. However, the attempt to deport her was halted for no specific reason. Ms. Sakeik was given four different scenarios ass to why it was stopped: 1) No Travel document has been issued yet,, 2) The war in the Middle East, 3) They want her to travel using a commercial flight instead of a charter, and 4)Israel refused to accept her. Since then, an ICE officer has told Ms. Sakeik that she could be deported anywhere. At any minute, Ms. Sakeik could face unlawful deportation without having had the opportunity to seek protection.

2

4. Respondents' efforts to detain and deport Mrs. Sakeik are unlawful for multiple reasons. First, the detention and attempted deportation violate Mrs. Sakeik's due process rights under the Deferred Enforced Departure program. Second, the detention and attempted deportation of Mrs. Sakeik violate her due process rights with respect to the protections she has held under the 2015 order of supervision. Third, the detention and attempted deportation of Mrs. Sakeik to Israel violate her rights under the INA to seek protection from removal to a country where she may face persecution.

5. This Court should issue a limited stay of removal so that Mrs. Sakeik can be afforded the opportunity to seek protection from removal to any country to which ICE may seek her deportation.

6. Separately, this Court should consider ordering Ms. Sakeik's release.

## JURISDICTION

7. This action arises under the Fifth Amendment of the Constitution of the United States and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*

8. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), 1361, 2241, 2243, and Article I, § 9, cl. 2 of the United States Constitution (Suspension Clause).

9. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651 and the Declaratory Judgment Act, 28 U.S.C. § 2201.

## VENUE

10. Venue is proper in this district pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 1391 because Ms. Sakeik is detained in the Prairieland Detention Center in Alvarado, Texas, within the Northern District of Texas, Dallas Division.

## PARTIES

11. Petitioner Ward Sakeik was born in Saudi Arabia to Palestinian parents and was lawfully admitted to the United States in 2010, at the age of eight. Her father thereafter applied for asylum. After the immigration court ordered her family removed to Saudi Arabia, she has been under an order of supervision since 2015, as ICE was unable to procure travel documents for the family to Saudi Arabia. ICE detained Ms. Sakeik after she returned from her honeymoon trip to the U.S. Virgin Islands in February 2025. Ms. Sakeik is detained at Prairieland Detention Center in Alvarado, Texas.

12. Respondent Kristi Noem is named in her official capacity as the Secretary of the Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(a); is legally responsible for pursuing any effort to confine and remove the Petitioner; and as such is a custodian of Ms. Sakeik. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

13. Respondent Pamela Bondi is named in her official capacity as Attorney General of the United States. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g); and as such is a custodian of Ms. Sakeik. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

14. Respondent Todd Lyons is named in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement

of the immigration laws of the United States and is legally responsible for pursuing any effort to remove Ms. Sakeik and confine her pending removal. As such, he is a custodian of Ms. Sakeik. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-590.

15. Respondent-Defendant Josh Johnson is named in his official capacity as Acting Director of the ICE Enforcement & Removal Operations ("ERO") Dallas Field Office in Dallas, Texas. In this capacity, he is responsible for the administration of immigration laws and the execution of immigration confinement and the institution of removal proceedings within North Texas, which is the jurisdiction where Ms. Sakeik is confined. As such, he is a custodian of Ms. Sakeik. Respondent-Defendant Johnson's address is 8101 North Stemmons Freeway, Dallas, Texas 75247.

16. Respondent-Defendant Thomas Bergami is named in his official capacity as the Warden of Prairieland Detention Center. In this capacity, he oversees the daily administration of the detention center where Ms. Sakeik is in custody. As such, he is a custodian of Ms. Sakeik. Respondent Bergami's address is 1209 Sunflower Lane, Alvarado, Texas 76009.

## STATEMENT OF FACTS

### Ms. Sakeik's history in the United States

17. Mrs. Sakeik was born in Saudi Arabia in 2002. Her father is a Palestinian and did not hold any form of permanent residence in Saudi Arabia.

18. In August 2010, at the age of eight, Mrs. Sakeik traveled with her family to the United States and was lawfully admitted on a non-immigrant visa on an Egyptian travel document.

5

19. Thereafter, her father filed an application for asylum. This application was denied by the immigration court in 2011. Mrs. Sakeik was listed as a derivative beneficiary on her father's asylum application. Mrs. Sakeik and other members of her family were ordered removed to Saudi Arabia. Mrs. Sakeik's father filed motions to reopen with the immigration court and the Board of Immigration Appeals, but these were denied.

20. On June 12, 2015, ICE placed the family on an Order of Supervision because they had been unable to procure travel documents for Saudi Arabia for the family.

21. Mrs. Sakeik has dutifully complied with all of the requirements of the June 12, 2015, Order of Supervision. She has attended all check-in appointments and has never been arrested or charged with a crime.

22. Mrs. Sakeik also built a life in the Dallas area with her family. She completed high school in 2020 in Mesquite, TX. Mrs. Sakeik subsequently completed her undergraduate education at the University of Texas at Arlington, earning a bachelor's degree in broadcast journalism and graduating with honors.

23. In 2023, Mrs. Sakeik started a successful wedding photography business.

24. In January 2025, Ms. Sakeik married Taahir Sheikh, a U.S. citizen.

25. Ms. Sakeik traveled with her spouse to the U.S. Virgin Islands for their Honeymoon in January 2025. Ms. Sakeik and her husband traveled to the U.S. Virgin Islands and flew back on February 10, 2025.

26. Upon return, Mrs. Sakeik presented her paperwork to a U.S. Customs and Border Protection officer. CBP made the decision to detain Mrs. Sakeik, despite the fact that Mrs. Sakeik was returning from a trip within the United States, had no criminal

history, and otherwise had a spotless record of complying with the June 12, 2015,

Order of Supervision, and despite the Deferred Enforced Departure program.

27. Prior to her detention, Mrs. Sakeik's next check-in date for June 12, 2015, Order of

Supervision, was July 2025.

28. Ms. Sakeik was first detained at the Broward Transitional Center in Pompano Beach,

FL. Then, she was transferred to Harlingen Detention Center in Texas.

29. At no point did ICE explain to Mrs. Sakeik why her order of supervision was being

revoked, despite her perfect compliance going back nearly ten years.

30. Shortly after her initial detention, Mrs. Sakeik's counsel sought her release, including

pursuant to the Deferred Enforced Departure program. ICE refused to release Mrs.

Sakeik and to date, has not taken an official position as to whether Mrs. Sakeik is

within the DED-covered population of Palestinians.

31. In mid-May, Mrs. Sakeik participated in a 90-day custody review, providing

substantial evidence of her strong ties to the United States, a fixed address, stable

employment, lack of criminal history, and her marriage to a U.S. citizen. Mrs. Sakeik

resubmitted previous documentation, which showed that Saudi Arabia was unlikely to

issue a travel document for her. ICE denied her request for release again.

32. In mid-to-late May, ICE officers presented Mrs. Sakeik with travel document

applications to Israel and Saudi Arabia. ICE officers also presented Ms. Sakeik with a

travel document application for the Palestinian Authority. Mrs. Sakeik's family had

previously produced documentation to ICE that the Palestinian Authority does not

have a record of their family in the registry in the West Bank. Mrs. Sakeik's family

hails from Gaza.

33. Mrs. Sakeik complied with ICE's instructions, despite never having had an opportunity to claim fear from removal to Israel or the West Bank (under the Palestinian Authority).

34. On May 8, 2025, Ms. Sakeik filed a Motion to Reopen with the Board of Immigration Appeals. This motion is currently pending, and an Emergency Stay of Removal was filed with the Board of Immigration Appeals on June 12, 2025.

### Mr. Shaikh Files an I-130 Petition for Ms. Sakeik

35. On February 14, 2025, Mrs. Sakeik's spouse, Mr. Taahir Shaikh ("Taahir"), filed an I-130 Petition for Alien Relative on her behalf.

36. On May 13, 2025, Mr. Shaikh requested expedited processing of the I-130 petition. And, on May 29, 2025, USCIS notified Mr. Shaikh that they had determined that his situation meets the minimum criteria for an expedited request, and it will be forwarded to the office that has jurisdiction over the case.

37. If the I-130 petition is approved, Ms. Sakeik would become eligible for adjustment of status to that of a lawful permanent resident.[1]

### ICE Attempts to Deport Ms. Sakeik

38. On June 11, 2025, Ms. Sakeik was transferred from Raymondville, TX, to the Prairieland Detention Center in Alvarado, TX.

39. On June 12, 2025, officers in Prairieland came to Mrs. Sakeik and ordered her to stand in line with four other Palestinians. Mrs. Sakeik could see a tag that reads "Israel" on one of the Palestinians' luggage.

---

[1] This would require the Board of Immigration Appeals to grant a motion to reopen and terminate proceedings against Ms. Sakeik before she could be granted lawful permanent resident status.

40. Up until this point, ICE had not informed Mrs. Sakeik that she was about to be deported, nor had they informed her that they would seek to deport her to Israel, a country that she has no ties to, and that she fears persecution in, as a Palestinian.

41. At some point during this process, Mrs. Sakeik's request to see her travel document went to no avail. She was told it was not necessary, and she was going to be deported.

42. On the evening of June 12, 2025, Mrs. Sakeik and several other individuals were taken to the Fort Worth Alliance Airport on multiple buses.

43. Mrs. Sakeik was in a bus with at least four other Palestinian individuals. Upon information and belief, all of these individuals were set to be sent to Israel.

44. Mrs. Sakeik was told by an ICE officer that she would be taken to a "border with Israel" and dropped off. Mrs. Sakeik, reasonably frightened of the prospect of being sent to a country she has no connections to, and a place where she has a reasonable fear of persecution on account of her race, religion, political opinion, and nationality as a Palestinian, expressed this fear. One of the ICE officers explicitly stated that it did not matter because she had a final order, and she would be sent on the flight.

45. Mrs. Sakeik stayed in the bus among other Palestinians for about two hours. And then, the plane took off without them, and they were driven back to the Prairieland Detention Center.

46. The next day, Mrs. Sakeik received conflicting reasons as to why they had not been deported to Israel.

47. On June 12, 2025, Mrs. Sakeik's counsel filed an emergency motion for a stay of removal with the BIA, which is currently pending.

*Deferred Enforced Departure*

48. The official website of U.S. Citizenship and Immigration Services ("USCIS")

describes the Deferred Enforced Departure (DED) as follows:

> DED is in the president's discretion to authorize as part of his constitutional power to conduct foreign relations. Although DED is not a specific immigration status, individuals covered by DED are not subject to removal from the United States for a designated period of time.

https://www.uscis.gov/humanitarian/deferred-enforced-departure (last accessed June 13, 2025).

49. On February 14, 2024, President Joseph Biden issued a memorandum to the Secretary

of State and the Secretary of Homeland Security (Secretary) determining that it was in

the foreign policy interest of the United States to defer for 18 months, through August

13, 2025, the removal of certain Palestinians present in the United States and to provide

them with employment authorization documentation.

50. Although DED is not a specific immigration status and does not require an application

to be filed with USCIS, individuals covered by DED are not subject to removal from

the United States, usually for a designated period of time.[2]

51. Furthermore, the President may direct that the Secretary of Homeland Security provide

that certain benefits that are authorized under the immigration laws, such as

employment authorization, be made available to the noncitizens covered by the DED

directive during the designated period.

52. USCIS publishes a Federal Register notice to inform the covered population on how to

apply for any benefits provided. The eligibility requirements for individuals who are

covered by DED are based on the terms of the President's directive regarding DED and

any relevant implementing requirements established by DHS. Since DED is a directive

---

[2] At the time of filing, there are two other DED covered populations – Lebanon and Liberia.

to defer removal of an individual, rather than a specific immigration status like Temporary Protected Status, there is no DED application form required for an individual to be covered by DED.

53. DED for eligible Palestinian noncitizens began on February 14, 2024, and ends on August 13, 2025.

54. According to the USCIS official website, DED covers non-U.S. citizens of any nationality, or without nationality, who are Palestinian. USCIS will evaluate claims for DED employment authorization and advance travel authorization based on authentic documents,[1] regardless of validity period [2] or expiration, indicating the applicant is Palestinian, including, but not limited to:

- a Palestinian Authority Passport;
- a Palestinian Authority Identification Card;
- a Birth Certificate or Birth Extract verified or issued by a recognized governmental authority identifying the holder as having been born in the Palestinian Territories;
- an identification document issued by a third country, the United Nations, its specialized agencies and related organizations, or the International Committee of the Red Cross, indicating the holder is a Palestinian; or
- a travel document issued by a third country, the United Nations, its specialized agencies and related organizations, or the International Committee of the Red Cross, identifying the holder as a Palestinian.

55. Ms. Sakeik holds an identity document that would place her within the DED-covered population as a Palestinian.

56. The USCIS website states that the purpose of the DED is to defer the removal of certain Palestinians who have resided in the United States since February 14, 2024.

57. The DED notice for Palestinians lays out certain categories of individuals who will not be eligible for DED.[3] Upon inquiry and belief, Mrs. Sakeik does not fall into any of these categories.

58. In establishing and continuously operating the DED program under a well-defined framework and highly specific criteria, the federal government created a reasonable expectation among covered individuals that they would be able to live and work in the United States for a specified period without being subject to arrest and deportation based on their immigration status.

59. This reasonable expectation creates a constitutionally-protected liberty and property interests for DED recipients in the benefits they enjoy: being able to live and work in the United States without fear of deportation, so long as they satisfy the requirements. *See, e.g., Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972) (reliance on informal policies and practices may establish a legitimate claim of entitlement to a constitutionally-protected interest); *see also Texas v. United States*, 809 F.3d 134, 174 (2015), affirmed by an equally divided court, 136 S. Ct. 2271 (2016) (explaining that "DED involve[s] issuing benefits" to certain applicants). And these benefits are entitled to constitutional protections no matter how they may be characterized by DHS. *See, e.g., Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002). ("[T]he identification of property interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the state or other independent source.") (internal quotations omitted).

---

[3] *See* USCIS, DED Covered Population – Palestinians, https://www.uscis.gov/humanitarian/deferred-enforced-departure-ded-covered-population-palestinians (last accessed June 15, 2025).

60. Accordingly, the federal government may not arbitrarily or capriciously deprive DED recipients of these benefits, as they have here with Ward.

***Legal Limits on the Re-Detention of People Subject to Final Removal Orders***

61. Section 1231(a) of title 8 of the United States Code governs the detention of noncitizens subject to final removal orders. The statute establishes a 90-day period during which a noncitizen with a final removal order "shall" be removed, and provides that the Executive "shall" detain the noncitizen during that period. 8 U.S.C. §§ 1231(a)(1) and (2). The removal period begins on the "date the order of removal becomes administratively final" (unless the noncitizen seeks judicial review or is confined by authorities other than immigration officials). 8 U.S.C. § 1231(a)(1)(B).

62. Beyond the 90-day removal period, ICE may detain or otherwise release a noncitizen subject to terms of supervision. 8 U.S.C. § 1231(a)(6). ICE's authority to release someone subject to supervision beyond the removal period is set out in 8 U.S.C. § 1231(a)(3) and its implementing regulations. Those regulations require that such an individual "demonstrate[] to the satisfaction of the Attorney General . . . that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such alien's removal." 8 C.F.R. § 241.4(d); *see also id.* § 241.4(e)(6) ("Before making any recommendation or decision to release a detainee, [ICE officials] must conclude that . . . "[t]he detainee does not pose a significant flight risk if released."); *id.* § 241.4(f)(7) (directing consideration of, *inter alia*, "likelihood that the alien is a significant flight risk or may abscond to avoid removal" in considering whether to release).

63. Under 8 C.F.R. § 241.4, the regulation under which ICE released Mrs. Sakeik under orders of supervision, the impracticability or unforeseeability of removal is not a condition for release. *See* 8 C.F.R. § 241.4(e) (requiring either that "[t]ravel documents for the [noncitizen] are not available *or*, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable *or not in the public interest*") (emphases added). In fact, the regulations explicitly provide that "[t]he Service may release [a noncitizen] under an order of supervision under § 241.4 if it determines that the [noncitizen] would not pose a danger to the public or a risk of flight, *without regard to the likelihood of the [noncitizen's] removal in the reasonably foreseeable future.*" 8 C.F.R. § 241.13(b)(1) (emphases added).

64. By contrast, release pursuant to a separate provision, not applicable to Mrs. Sakeik, explicitly requires a determination "that there is no significant likelihood of removal in the reasonably foreseeable future." 8 C.F.R. § 241.13(b)(1).

65. When ICE releases someone after the 90-day removal period, its ability to re-detain that person turns on which regulation governed ICE's release decision. For individuals whom ICE released under 8 C.F.R. § 241.13, revocation of release is allowable based on a "determin[ation] that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2).

66. By contrast, for individuals whom ICE released under 8 C.F.R. § 241.4, imminent or even foreseeable removal is not among the grounds for revocation of release. Instead, re-detention is limited to situations where:

    a. The purposes of release have been served;

b.   The alien violates any condition of release;

c.   It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or

d.   The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

67. The omission of foreseeable removal from § 241.4(l) is significant in light of its use in a nearby section of the regulations. Indeed, "[w]here an agency includes particular language in one section of a regulation but omits it in another, it is generally presumed that the agency acts intentionally and purposely in the disparate inclusion or exclusion." *Yonek v. Shinseki*, 722 F.3d 1355, 1359 (Fed. Cir. 2013) (quotation marks and alterations omitted) (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)). Thus, for those previously released under 8 C.F.R. § 241.4, like the petitioner, imminent removal cannot serve as the sole basis for revocation of release.

68. This construction is not only permissible but essential in order to give 8 C.F.R. § 241.4 a saving interpretation. Permitting revocation of release and re-detention on the sole basis of imminent removal, without an individualized finding that an individual now poses a flight risk or danger, would violate the requirements of the Due Process Clause. The Supreme Court has held that preventing flight risk and danger are the sole legitimate purposes of immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (permissible regulatory goals of civil detention are "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community"); *cf. Diouf v. Napolitano*, 634 F.3d 1081, 1090 (9th Cir. 2011) ("We

may not defer to DHS regulations interpreting § 1231(a)(6), [] if they raise grave constitutional doubts.").

69. For individuals whom ICE previously released under an order of supervision and for whom ICE is now considering re-detention, due process requires not only an individualized assessment but also a showing by ICE of changed circumstances demonstrating why the person now poses a flight risk or danger, where they had not when ICE decided to release them previously.  Before ICE releases an individual beyond the removal period pursuant to an order of supervision, it necessarily must find that the individual does not pose a danger or flight risk despite their removal being potentially foreseeable.  8 C.F.R. § 241.4 (d)-(f).  To comport with due process, the regulations governing revocation of release must be construed to require an individualized showing as to why that earlier assessment has changed, such that detention is now necessary to serve a legitimate purpose.  *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1200–06 (N.D. Cal. 2017) (where unaccompanied minor was previously found not to be dangerous or flight risk, due process requires that he or she "cannot reasonably be rearrested absent a material change in circumstances" and "a prompt hearing in which the government must show that these changed circumstances exist"), *aff'd*, 905 F. 3d 1137; *Rombot v. Souza*, 296 F. Supp. 3d 383, 386–89 (D. Mass. 2017) (despite wide latitude to detain noncitizens with final orders of removal, ICE does not have "carte blanche to re-incarcerate someone without basic due process protection"); *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981) (requiring changed circumstances to justify re-detention of individual previously released on bond by immigration judge). *See also Zinermon v. Burch*, 494 U.S. 113, 135–39

(1990) (specifying three factors for assessing when Fifth Amendment requires predeprivation process for a civil deprivation of liberty: (1) whether the governmental interest in the deprivation is unpredictable, (2) whether predeprivation process is impossible, and (3) whether the deprivations result from "unauthorized" conduct); *id.* at 139 ("This case does not represent the special instance of the *Mathews* due process analysis where postdeprivation process is all that is due because no predeprivation safeguards would be of use in preventing the kind of deprivation alleged."); *Chhoeun v. Marin*, Civ. No. 17-1898, 2019 U.S. Dist. LEXIS 17560, *3–8 (C.D. Ca. Jan. 3, 2019) (issuing TRO forbidding re-detention without the government's first providing targeted individuals at least 14-days' notice).

## CAUSES OF ACTION

## COUNT ONE
## FIFTH AMENDMENT – PROCEDURAL DUE PROCESS

The allegations in the above paragraphs are realleged and incorporated herein. Procedural due process requires that the government be constrained before it acts in a way that deprives individuals of liberty and property interests protected under the Due Process Clause of the Fifth Amendment. One of the first inquiries in any case of violation of procedural due process is whether the plaintiff has a protected property or liberty interest and, if so, the extent or scope of that interest. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972).

Here, a legitimate claim of a protected property interest exists by virtue of the promise made by the United States government to Ward that she would not be deported so long as she adhered to the strict terms of her order of supervision and the Deferred Enforced Departure.

Where, as here, an existing framework established by the government and individual's

17

reasonable expectations based on that framework give those individuals benefits that they would not otherwise have, a property right to those benefits exists. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972) (A legitimate claim of entitlement is created "and [its] dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

Despite both Order of Supervision and DED being temporary and discretionary, administrative stay of removal ordered, either by ICE or the U.S. president, that discretion is not unfettered and is constrained by the rules and criteria on which DED and the order of supervision is based on. These constraints on discretion further support Ward's claim of a protected property interest here. *See Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1190–91 (9th Cir. 2015) citing *Griffeth v. Detrich*, 603 F.2d 118, 121 (9th Cir. 1979) (Holding that plaintiffs have a protected property right in public benefits when, as here, a statute authorizes those benefits and the "implementing regulations" "greatly restrict the discretion" of the people who administer those benefits).

> Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Courts employ the Eldridge test when an alien's due process liberty interests are at stake. See Flores-Chavez v. Ashcroft, 362 F.3d 1150, 1160–61 (9th Cir. 2004). The test considers three factors: (1) the private interest affected by the official action, (2) the risk of erroneous deprivation of that interest through the procedures used, and (3) the government's interest. *Id.* at 1061. It requires courts to balance the affected interests to see "whether the administrative procedures provided here are constitutionally sufficient."

*Id.* DHS policy provides that ICE officers who encounter individuals who are eligible for DED "should be released from DHS detention.[4] Consistent with this directive, Ward—unquestionably meets all of the criteria for DED, and therefore, she should not have been arrested or detained. Respondents, having knowledge that Ward met the criteria for DED, violated Ward's procedural due process rights by arresting and detaining her.

Ward's interest, affected by Respondents' actions is profound — her physical liberty. Ward was arrested and is being unlawfully detained, despite the fact that she committed no crime and is neither a flight risk nor a danger to public safety nor national security. *See Matter of Patel*, 15 I. & N. Dec. 666, 666 (B.I.A. 1976) ("An alien generally is and should not be detained or required to post bond except on a finding that he is a threat to the national security, or that he is a poor bail risk."). Therefore, at best, the government's interest in his continued detention is minimal.

Under the *Eldridge* test, Ward's expansive liberty interest far outweighs the government's minor interest in her continued detention. She has twice met the specific criteria for the DED program outlined by DHS, has been found to be no risk to public safety or national security, and has been granted deferred action under that framework. Ward received no due process before her arrest and detention, as she was denied both notice and a hearing.

For all of the foregoing reasons, Ward's detention is in violation of the procedural due process rights guaranteed by the Fifth Amendment.

**Ward is eligible for Adjustment of Status**

Ward is currently eligible to adjust her status under INA 245(a). Aliens are not entitled to discretionary relief under the Immigration and Nationality Act (INA) as a matter of right; they are,

---

[4] See Adjudicator's Field Manual.

however, given a right to a ruling on such relief. *Patel v. United States Att'y Gen.*, 971 F.3d 1258 (11th Cir. 2020), *aff'd sub nom. Patel v. Garland*, 596 U.S. 328 (2022). Having created a reopening remedy that can defeat removal, the government cannot be allowed to destroy the remedy and so ensure removal by creating procedural roadblocks that prevent the alien from invoking the procedure. Such would be a deprivation of liberty without due process of law, and would therefore be judicially reviewable even if the petition for review did not present a question of law but merely a question of fact (such as whether a notice of hearing had been sent to the alien), because the statute governing judicial review of rulings by the Board of Immigration Appeals allows review of a discretionary ruling that is claimed to deny a constitutional right. *Jezierski v. Mukasey*, 543 F.3d 886, 890 (7th Cir. 2008).

Respondents, having knowledge that Ward met the criteria for adjustment of status, violated her procedural due process rights by arresting and detaining her. Moreover, Ward's interest affected by Respondents' actions is profound — her physical liberty. Ward was arrested and is being unlawfully detained, despite the fact that she committed no crime, and is neither a flight risk nor a danger to the public safety nor national security. *See Matter of Patel*, 15 I. & N. Dec. 666, 666 (B.I.A. 1976) ("An alien generally is and should not be detained or required to post bond except on a finding that he is a threat to the national security, or that he is a poor bail risk."). Therefore, at best, the government's interest in her continued detention is minimal.

Under the *Eldridge* test, Ward's expansive liberty interest far outweighs the government's minor interest in her continued detention. She meets the criteria for the adjustment of status under INA 245(a), and she is no risk to the public safety or national security. And Ward received no due process before his arrest and detention, as he was denied both notice and a hearing.

For all of the foregoing reasons, Ward's detention is in violation of the procedural due process rights guaranteed by the Fifth Amendment and violates the Due Process Clause of the Fifth Amendment.

## COUNT TWO

## FIFTH AMENDMENT –SUBSTANTIVE DUE PROCESS

Petitioner repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

Ward's continued detention violates her right to substantive due process through a deprivation of the core liberty interest in freedom from detention and bodily restraint.

Aliens who are physically present in the United States are guaranteed the protections of the Due Process Clause of the Fifth Amendment. See, e.g., *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); Mathews v. Diaz, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law.")

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Any deprivation of this fundamental liberty interest must be accompanied not only by adequate procedural protections, but also by a "sufficiently strong special justification" to outweigh the significant deprivation of liberty. Id.; see also Phan v. Reno, 56 F.Supp.2d 1149, 1154 (W.D. Wash. 1999) ("Above and beyond the procedural guarantee explicit in the Due Process Clause itself, federal courts have long recognized a limited 'substantive' component that 'forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'") (citing Reno v. Flores, 507 U.S. 292, 301–02 (1993)).

22

Ward is a stateless Palestinian who was released under order of supervision since 2015 because ICE could not find any country that would accept her. After Ward was arrested and detained by ICE, she was not afforded a notice to explain as to why her order of supervision was revoked. To date, Ward is unaware of the reasons. Although she had a meeting with her Deportation officer, Vivian Delgado, in the Boward Detention Center, she was not informed of the reasons behind the revocation. The deportation officer just asked her to sign a paper to obtain a travel document, and her photo was taken.

Ward relied on the government's promise that, so long she abides by the terms of her supervision order and no country would accept her, her deportation will be deferred. Ward has abided by the terms of the order of supervision. She has been reporting to ICE since then. She has not committed any crime of even a traffic ticket. Certainly, no country will issue her a travel document or will accept her in its territory since ICE has been unsuccessful to do so for almost ten years.

Moreover, Ward's deportation is deferred pursuant to Deferred Enforced Departure. She relied on the government's promise that she would not be deported, and if she were in DHS custody, she would be released. Accordingly, Ward's detention is indefensible, convicting an alien for exercising a privilege that the government told her was available to her and deprivs Ward of her constitutional right to due process.

For all of the foregoing reasons, Ward's detention is in violation of her substantive due process rights.

## COUNT THREE

### Violation of 8 C.F.R. § 241.13

The allegations in the above paragraphs are realleged and incorporated herein. Ward's continued detention is a regulatory violation. The federal regulations clearly state that the custody review procedures in section 8 C.F.R. § 241.4 do not apply after the Service has made a determination, pursuant to the procedures provided in 8 CFR 241.13, that there is no significant likelihood that an alien under a final order of removal can be removed in the reasonably foreseeable future unless the Service subsequently determines otherwise because of a change of circumstances.

Ward has been detained since February 10, 2025. She complied with the deportation officer's instructions. She then signed all the necessary paperwork and complied with the ICE officers' instructions in order to obtain a travel document, and ICE took a passport photo of her. Ward has been detained for over 90 days. She was not informed that DHS had successfully obtained a travel document, nor was she informed of any change in circumstances, that there is a significant likelihood that she may be removed to Saudi Arabia in the reasonably foreseeable future.

In fact, ICE issued the order of supervision in 2015, following all the unsuccessful attempts to obtain travel documents for her and her family. Moreover, Ward was never informed of the reasons that led to the revocation of her order of supervision, nor whether there is a country that will issue her a travel document and accept her.

On June 11, 2025, Ward learned that she would be removed to Israel. Before leaving Prairieland Detention Center, she saw a tag that read "Israel" on the top of her bag. Ward was then taken to the airport. Ward was not given a written notice ten days before her removal or afforded the opportunity to raise a claim under CAT prior to removal. Accordingly, Defendants violated the Preliminary Injunction entered in case number 25-10676-BEM by failing to provide six non-citizen class members a "meaningful opportunity" to assert claims for protection under the Convention Against Torture before initiating removal to a third country. If a statute renders an alien eligible to be considered for certain relief by an agency, the alien may raise it on habeas. *Wong v. Ashcroft*, 320 F. 3d 130, 142-43 (2d Cir. 2003).

## **PRAYER FOR RELIEF**

Wherefore, Ward prays that this Court grant the following relief:

(1) Issue a Writ of Habeas Corpus requiring Respondents to release Ward forthwith;

(2) Issue an injunction ordering Respondents not to arrest or detain Ward, on the basis of the conduct described herein;

(3) Award Ward reasonable costs and attorney's fees; and

(4) Grant any other and further relief that this Court may deem fit and proper.

Dated: June 13, 2025

Respectfully submitted,

*/s/ Waled Aly Elsaban*
*Counsel for Petitioner*

25

## VERIFICATION PURSUANT TO 28 U.S.C. § 2242

I represent Petitioner, Ward Sakeik, and submit this verification on her behalf. I hereby verify that the factual statements made in the foregoing Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated this 22nd day of June, 2025.

 s/Waled Aly Elsaban
Elsaban Law Firm
2711 LBJ Fwy. STE 710
Farmers Branch, Texas 75234
Tel: 972-532-1775
waled@elsabanimmigration.com